White, J. and Elmer, J.
concurred.
The state of the case being set out in the preceding opinion of the Chief Justice, it is deemed unnecessary to repeat it here, although annexed to and connected with the following opinion of
Nevius, J. It is submitted, that if, in the opinion of this court, the demandant upon these facts, is entitled to dower, judgment shall be entered on the postea for her, otherwise the verdict to be set aside with costs.
The first question which presents itself for our consideration, is, what estate or interest James Yeo, the demandant’s husband, had in these premises, by virtue of the several conveyances, or any of them, above mentioned ?
I will at present consider this question without reference to any supposed disability in ‘him to hold lands, arising from his being an alien.
The deed from Covert and wife, in 1813, to Baldwin, vested in Yeo a beneficial or equitable estate or interest in the lands, denominated a trust, whilst it conveyed, at the same time, to Baldwin, the legal estate in fee simple. This equitable estate was not limited to Yeo personally, but was an estate of inheritance in fee simple, being to him and his heirs and assigns. The equitable was made co-extensive with the legal estate. The deed from Baldwin to Parcell, in 1814, conveyed the legal estate, subject to the same equitable interest in Yeo, as it before was vested in him. In November, 1814, Parcel], by covenant, gave to Yeo the control of the legal estate, and covenanted to convey it to him, or to such person as he might appoint. This declaration of trust was acknowledged on the 5th, and recorded on the 10th of June, 1815; and on the 6th of the same month of June, Parcell and wife conveyed the premises in fee simple to Leonard, and in his deed of conveyance, recited the deed from Baldwin, the declaration of trust by himself, and that Yeo had requested this conveyance to be made for his own benefit; and that Leonard had paid the consideration money on his (Yeo’s) account. This deed was recorded on the same day with the declaration of trust, and two days before the deed from Parcell and wife to Leonard, *399 which did not, on its face, contain the trust. Apart, then, from the conveyance of these premises, during the time that James Yeo may be esteemed an alien enemy, we have a regular and legal conveyance of a legal estate of inheritance in these lands, made to a third person for his benefit, at his request, and on his payment of the consideration money. If, by the laws of this state, such a conveyance can be made and legally sustained, then James Yeo, by the grant to Leonard in 1815, became entitled to an equitable interest in these lands, when he was no longer an alien enemy.
What is this equitable or beneficial estate to be termed — a use or a trust ? or is there now, or was there ever, any real and substantial difference between them ? The importance of a correct answer to this question, will be seen by reference to our statute relative to dower, upon the true construction of which, tne demandant’s right will greatly depend. That statute enacts that “ the widow, whether alien or not, shall be entitled to dower in any lands of which her husband, or any other person to Ms use, was seized of an estate of inheritance during the coverture.” The grant from Parcel! to Leonard, in 1815, taken in connection with the declaration of trust, was in trust for Yeo and his heirs, for his and their benefit, subject to his and their control and authority, and, by virtue of that declaration, Yeo became entitled, whenever he saw fit to demand it, to the actual possession and enjoyment of the land itself. This was a condition annexed to the legal title, running with the land, and duly recorded ; consequently Leonard, who was the grantee of Parcell, with full notice of this trust, held his title subject to it in the same way that Par-cell did before his grant. Yeo had the highest estate in these lauds, which by possibility he could have, separate from the legal title, for he had the whole beneficial interest, with the power to connect the legal estate and possession with it, whenever he saw fit to do so. I repeat, therefore, the question, was he, in respect to these lands, a cestui que use or a cestui que trust f or was he not, in fact, both ? Can any difference between the two be pointed out, except in the arbitrary decisions of courts, which, at an early period after the passage of the statute of uses, were made to avoid the operation of that statute. Can any one show a substantial difference between a conveyance of land to A., to be held by him *400 and his heirs forever, for the use of B. and his heirs, and of a like conveyance to A. and his heirs, to be held in trust for B. and his heirs ? I speak now of a conveyance before the statute, when a use and a trust were esteemed convertible terms. Since the statute of uses, it is true, they have been considered different things, and as expressing different interests and different estates. 1 South. 265. The statute did not change the original meaning of the terms, but to avoid its operation, and to keep separate the legal estate, from the use or equitable interest, the court in its construction, adopted an arbitrary distinction between a first and second use, limited in the same deed; the former they declared executed by being annexed to the possession under the operation of the statute, whilst they determined that the latter was beyond its operation; and to avoid the apparent absurdity of such construction, they called this latter use a trust. Its nature and character remained the same, though its name was changed. 2 Blao. 336. By this refinement, a trust was understood to be a use unexecuted by the statute, whilst the use itself was abolished by its connection with the legal estate. At common law, a deed of bargain and sale, by the owner of lands, though for a valuable consideration, if unaccompanied with livery of seizin, only raised a use in the bargainee; and the statute transferred the use to the possession, thereby vesting in the bargainee a complete title, without formal livery of seizin. To defeat this provision, a second use was created, which the courts declared unexecuted by this statute, and such second use still remained as at common law.
The statute of New-Jersey, upon this subject, differs in its phraseology from the act of Parliament, yet I apprehend the difference is verbal and not substantial. The latter enacts that “ the person to whom the use is granted, &e., shall stand and be seized, deemed and adjudged in lawful seizin and possession; ” while the former provides that “ he shall be deemed in as full possession as if he were possessed thereof by solemn livery of seizin.” These words are equivalent in their meaning, and as fully adapted to transfer the possession to the use, as those used in the British statute. The conveyance to Leonard, then, vested in Yeo an estate denominated a trust, or, in other words, a use unexecuted by the statute. It was to Leonard and his heirs and assigns, to have and to hold to his and their use in trust for Yeo, *401 his heirs and assigns. The statute executed the use conveyed to Leonard, but not that use or trust which was created by the same deed in Yeo.
The next question presented is, whether this estate in Yeo is under our statute, subject to his wife’s dower, or whether it is an estate of which Leonard, or Parcel], or Baldwin was “seized to his use?” It is not necessary to consider the conveyance made by Parcel! to Leonard, and which was recorded on the 12th of June, 1815, and in which no mention is made of the trust, nor the other matters of subsequent date, which are set forth in the case, for they cannot affect the decision of this question. The estate of which a wife is endowable under our statute, must be an estate of inheritance, of which the husband was seized during the coverture, or of which any other person was seized to Ms use. The legal estate in Leonard was an estate of inheritance, and the equitable estate in Yeo was equally so. Was the latter such an estate as is embraced within the terms or meaning of the statute ? In the view taken of this subject by the Chief Justice, in the ease of Montgomery v. Bruere, above cited, he suggests “ that the legislature may have entertained a doubt whether a cestui que use, under our statute, for tranferring uses-into possession, was ‘ so seized ’ as to entitle his wife to dower, and that this clause was inserted to remove such doubtand concludes by remarking, that “ our act leaves the doctrine of dower where it stood at the common law, as altered by the statute of 27th Henry 8th.” This opinion, however, was not expressly concurred in by the other judges: Justice Southard expressly dissented. But as it did not become necessary to decide this question, in that case, it may still be considered as open, and unsettled in this state.
The high respect I entertain for the judicial character of the learned judge who expressed the opinion above quoted, would naturally lead me to adopt it even against serious doubts in my own mind of its correctness. But as my investigation has irresistibly led me to a different conclusion, I am constrained respectfully to dissent from that opinion. I cannot admit that, at the time of passing our act relative to dower, in 1799, a doubt could have existed in the mind of its learned penman, or in the legislature who passed it, that the wife of a bargainee of an estate *402 of inheritance in lands, had a dower in such lands, or that the words “seized to Ms use” were inserted to obviate such doubt. For a long period antecedent to this, the wife’s right to dower in a use executed by the statute, had been esteemed as settled law; indeed, no ease is found where it was questioned. Andas the statute of uses had originated a new mode of conveyance, whereby the formality of livery of seizin was dispensed with, it would have followed, as a necessary consequence, that if the wife could not be endowed of such an estate, she could not be endowed at all; and that the statute of uses had a'ctually abolished dower. It is true that when uses at common law were, by the ingenuity of courts, saved from the operation of the statute, by changing their name and not their character, they were not subjected to dower, “more,” as Judge Blackstone observes, “from a cautious adherence to some hasty precedents, than from any well-grounded principle.” And it is fair to infer that it was rather to remedy the evil and injustice arising from these “ hasty precedents,” that the legislature introduced the words “seized to Ms use,” than to explain the statute of uses, which had always before been clearly understood. “ Seized of an estate of inheritance to the use of another,” is a phrase which, in 1799, could convey no other idea to a legal mind, than that the person so seized was seized of the legal estate in trust for another, to whom was limited the beneficial interest. This phrase could not be intended to apply to a use executed by the statute, for the statute had extinguished such use by vesting the full title in the cestui qiie use, in the same manner as if he “were possessed by solemn livery of seizin.” These words were used by the penman of that statute, in their ordinary and natural sense, and were intended to apply to estates held in trust, or, if you please, to a use unexecuted by the statute. If such were not the design of the legislature, the ■terms were idly used, for they can convey no other meaning. I am, therefore, of opinion, that the estate of James Yeo, in these lands, was and is subject to the demandant’s dower, unless barred by cause of his alienage. Does the alienage of the husband ■create such a bar ? The defendant contends that the wife is only endowable of lands of .which her husband was seized in fee simple or fee tail, or which any issue which she may have may by possibility be heir; and that, in the case before us, as no children *403 of the demandant could by possibility be heir to these lands, as they could not inherit from their alien ancestor, she cannot consequently claim dower. Such was, in fact, the rule of the common law: and whether our statute, has changed the rule as to the inheritance in which a wife may be endowed, I deem it-unneeessary now to enquire. It speaks of estates of inheritance in general terms, without limiting the claim of dower to any particular kind of inheritance. But it is difficult to conceive of any other case in which a wife could claim dower in lands to which her issue might not be heir, than a case of inheritance in special tail, where a husband has married a second wife. Whether such wife, on the death of the husband, could, under our statute, be endowed of the lands so held by him in special tail, I will not determine, nor could' a decision on this point affect this case. For even if the rule of the common law has not been changed by statute, still I think the demandant entitled to dower, for her children can by possibility be heirs to this estate.
The statute, authorizing aliens to purchase and hold real estate, passed in 1817, provides that “ it shall be lawful for an alien friend to purchase lands within this state, and to have and to hold the same to him and his heirs and assigns, as fully and to all intents and purposes, as a natural born citizen may do.” And by the second section it is enacted, “that all purchases of lands within this state, which may have been made by aliens before the passing of the act, shall be deemed as good and effect-' ual as if the samo had been made after the passing of it.” This act was passed after the war with Great Britain had terminated, and from a careful examination of it, it would seem to have been the intention of the legislature not only to secure to alien friends the right to purchase and hold lands, but to settle and confirm the titles or purchasers before made by aliens, whether friends or enemies. For the second section does not limit such confirmation to purchases made by alien friends. The estate of Yeo, therefore, under the operation of this act, although an alien, became lawfully vested in him, whether it is to be esteemed as having its origin in the deed from Covert to Baldwin, in 1813, and. during the war, or resting in the grant from Paree:i to Leonard, in 1815, and after the war. No objection,.therefore, to the demandant’s claim, can arise from the fact that the original pur *404 chase was made when her husband was an alien enemy. But the question still recurs, did the alienage of the husband prevent his children from inheriting ? If an alien may purchase and hold lands to him and his heirs, he may of consequence transmit them by inheritance to his children. The statute places him on a footing with native born citizens, and gives him inheritable blood. Even if his children were aliens, they would take by inheritance. In the case of Goodell v. Jackson, 20th J. R. 707, Chancellor Kent remarks, “ That it is understood to be a general rule, that when an alien is allowed specially by statute, to take and hold lands to him and his heirs, he has of course a capacity to transmit by inheritance to his alien offspring or’other alien heirs, and they have equally a capacity to take.” This doctrine, which was held in the case of a patent granted by the state, to an alien, was approved in the case of Jackson v. Etz, 5 Cow. 321. And in a subsequent case in the same court, Jackson v. Adams, 7 Wend. 370, the court say, “ That if the doctrine be true in the case of a patent, it is not perceived why it is not equally applicable to the case of a-legislative grant, or authority to an alien to purchase and- hold lands to him and his heirs.” And in this case it was expressly decided, that “ if an alien, holding lands under an act of the legislature, authorizing aliens to purchase and hold lands to him and his heirs, dies intestate, his lands descend to his heirs, although they are aliens.”
Upon this statute, and these authorities, the children of James Yeo, who are also the children of the demandant, might have inherited the estate of their father in these lands, the demandant is entitled to her dower.
The only remaining question to be decided in the case, is whether the demandant’s remedy is in this court, or whether she is to resort to a court of equity to enforce her right ? The right of dower at common law, is a legal right, and it is especially so when allowed and defined by statute. The natural and appropriate remedy, therefore, would seem to be in a court of law. Yet, as was remarked by Chief Justice Marshall, in Herbert v. Wren, 7 Cranch, 307, “ the practice which prevails in England,” [and he might have added in this state] “ is, that courts of equity •and courts of law exercise a concurrent jurisdiction in assigning dower.”’ He also remarks, that “there are many reasons in *405 favor of chancery jurisdiction, and, among others, that partitions are made and accounts taken in a manner favorable to the purposes of justice.” It might be said, further, that the power of substitution, or granting an equivalent for this right, under certain circumstances, which a court of equity may exercise, makes it peculiarly proper that it should entertain such jurisdiction. The defendant, however, contends that here is a claim set up in a trust estate, and that trusts are exclusively the subject of equity jurisdiction. Two answers may be given to this proposition : 1st. Whore a trust is open and declared, it may be reached at law : 2nd. In the case before us, the dower secured by the statute* is not a right in the use or trust, but in the land itself. There is no impediment, therefore, in enforcing this claim in a court of law, nor any necessity of resorting to a court of equity.
I am of opinion, upon the whole case, that the demandant is entitled to her dower in the lands in question, and that judgment should be entered for her on the postea, with costs.

Judgment for demandant.

Cited in Colgan v. McKeon, 4 Zab. 573.