## DEN EX DEM. COLGAN v. McKEON AND OTHERS.

1. The act of 1846, which authorizes aliens to purchase lands and hold the same to them and their heirs, does not remove the disability of alienage from persons who would without it have been their heirs.

2. The legislature can, by a special act, grant lands which for want of heirs have escheated to the state, without an inquest of office having first been found. There is no statute in New Jersey restraining such grant, and if there were, any subsequent special act making such grant would *pro tanto* repeal such restraining statute. Whether the special act would

pass the title if any person other than the grantee was in possession? *quere.*

3. A statute simply granting lands of A, to which the state have no title, unto B, is void because this is no part of the *legislative* power, which is the only power vested in the legislature.

4. Lands which in 1834 escheated to the state by reason of the alienage of those who would else have been the heirs of the person dying seized, were, by a special statute of 1836, vested in the widow of the decedent. The provisions of the act of 1845, providing that such persons as would have been heirs of any person dying since 1817, in case such persons had been natural born citizens, shall inherit the lands of which such person died seized, are not sufficient to pass to such alien heirs the lands so vested in the widow prior to said act.

———

This was an action of ejectment commenced in this court. At the trial of the cause, in the Hudson Circuit, before Justice Haines, at December term, 1853, a verdict was entered for the plaintiff by the direction of the court, reserving to the defendants leave to move to set the same aside, and to have a verdict entered for them, if the court at bar should be of opinion, upon a case stated, that they were entitled to the verdict.

The facts in the case stated for the opinion of the court were these: The premises in question were conveyed in fee to Barney Colgan, on the 15th day of July, 1829. He died seized of the same on the 20th day of September, 1834, intestate, leaving Ann Colgan, his widow, surviving him, and leaving no descendants.

Barney Colgan was born in Ireland before 1800, and came to the United States in 1820, and continued therein without being naturalized, until his death. He had three children born in the United States, by Ann, his wife, who all died in his lifetime. He died leaving five brothers and one sister surviving, to wit: Kiernan Colgan and Thomas Colgan, two of the lessors of the plaintiff, John Colgan, Mary Colgan, and Andrew Colgan, all of whom were born in Ireland, and were aliens. Thomas and Kiernan were living in the United States at the death of Barney Colgan, and Thomas had one son, Barney Colgan, born in the United States and still living.

A special statute, passed April 17, 1838, (*Pam. Laws, p.*

—,) reciting that Barney Colgan had died seized of those lands without heirs capable of inheriting, granted all the title of the lands to his widow, Ann Colgan, saving the rights of lawful heirs. After this, Ann Colgan married John Stanton, one of the defendants, by whom she had issue born alive and then died. She had in her lifetime conveyed the part of the premises in possession of the defendant, Patrick McKeon, to grantees, who had conveyed it to McKeon. The defendant, John Stanton, had conveyed part of the premises of which his wife died seized, to the defendant, William Stanton.

The case was argued before the CHIEF JUSTICE and Justices HAINES and ELMER, by Mr. *Zabriskie* and Mr. *Dayton* for defendants, and by Mr. *Gilchrist* and Mr. *I. W. Scudder* for the plaintiff.

Mr. *Zabriskie.*

The main point in this cause depends upon the construction to be given to the act of January 22, 1817, (*R. L.* 604,) re-enacted in 1846. *Rev. Stat.* 1, *sect.* 1. Barney Colgan, an unnaturalized alien, died in 1834, seized of these lands, and leaving the lessors of the plaintiff his heirs at law, according to the statute of descent, if their alienage did not prevent their taking. This act provides that it shall be lawful for any alien to purchase lands within this state, and to have and to hold the same to him, his heirs and assigns forever, as fully as any natural born citizen may or can do. The lessors of the plaintiff contend that this enables the alien heirs of such purchaser to take by descent, and their title depends on this construction.

We contend that this act only enables the alien to purchase and hold and to transmit it to his heirs, who are such heirs by the law of this state ; that it does not enable him to transmit it to heirs who labor under the disability of bastardy or of alienage. When a statute uses words· that have in law a well settled signification, they will be construed in that sense only. This was settled in relation to this very

word heirs, and as applied to a person who left alien heirs, in the case of *The State* v. *Engle*, 1 *Zabr.* 360. This construction will satisfy the words of the act; any alien may have lawful heirs. In this case, had any of Barney Colgan's three children lived, they would have been his lawful heirs. They were natural born citizens. Had either of his brothers been naturalized before his death, such brother would have been his lawful heir.

Again the words of the statute are definite and certain, "as fully to all intents and purposes as any natural born citizen may or can do." Now, a natural born citizen cannot transmit to his alien heirs; this would be giving to an alien a larger and more liberal right to transmit by descent than to the citizen, or to the naturalized foreigner. If Barney had been naturalized in his life, his brothers could not have inherited. Can they now? Did the act contemplate an inducement to foreigners to remain here as aliens?

The adverse counsel rely for their construction upon the New York cases. *Hill* v. *Jackson*, 20 *Johns. R.* 693; *S. C.* 16 *Johns.* 288; *Jackson* v. *Adams*, 7 *Wend.* 367; and *Jackson* v. *Etts*, 5 *Cowen* 314; and upon a case in 3 *Pick.* 224, decided upon the authority of the New York cases.

But the acts on which these cases are founded, differ in their language from the New Jersey act. They do not contain its restraining words. They enact that the alien shall "hold to him and his heirs absolutely without any plea or disability of alienage;" and the leading case, *Hill* v. *Jackson*, was a grant to an Indian and his heirs, and the question was placed upon the ground that an Indian can have no heirs but aliens, as neither he or his blood can become citizens.

If the land did not descend to the alien kin of Barney Colgan, it escheated to the state, and the grant by the act of 1836 was good and vested the property in Ann Colgan. In New Jersey, lands which escheat, vest in the state before office found. This was expressly decided by the court of errors, in *Den* v. *O'Hanlon*, 1 *Zab.* 587.

See also, 7 *Johns.* 290 *and* 296; *Jackson* v. *Wood*, 9 *Johnson* 361; *Chandler* v. *Eagle*, 14 *Johns.* 472; 15 *Johns.* 264;

19 *Johns.* 127; 5 *Cowen* 399; 4 *W. and S.* 145; 3 *Denio* 229.

*Gilchrist,* contra.

The act of 1845 (*Revised Statutes, p.* 2) was for the purpose of enabling aliens to take by descent, and it was designed to be retrospective as well as prospective. The act of 1817 was intended to enable aliens to purchase. "Purchase" has a clear, definite meaning. At common law, the rule was different. He might at common law take by devise, gift, or grant, although he could not hold.

I. The estate passed and the fee vested. *Coke Litt.* 2 *b.*; 1 *Mass.* 256, *Sheaf* v. *O'Neal;* 4 *Cruise* 21, § 38; 10 *Mod.* 124, *ib.* 94; *Powell on Dev.* 316, 317; 5 *Coke* 52, *b.*; 1 *Vent.* 417; *Pace* v. *Hotting.*

II. Alien may alien until office found. 1 *Mass.* 356.

The true meaning of the act is, that an alien may *acquire* lands.

At common law an alien could have no heirs; he could take but not hold. *Coke Litt.* 2 *A;* 1 *Vent.* 417; 1 *Cruise* 151; 7 *Rep.* 125.

The policy of New Jersey legislation has been for many years to favor the purchase of lands by aliens. *Act of* 1772, *Pat. Laws* 26; *of* 1794, *ib.* 123; *of* 1799, *Pat. Laws* 452; *of* 1806, *Pam.* 716, *Bloom.* 172; 1814, *Pam.* 73, until the act of 1817.

In other states, the construction we contend for has been given to similar acts. They hold that an act enabling an alien to take lands impliedly enables him to transmit it to such heirs as an alien may have. 20 *Johns. R.* 707; *Goodell* v. *Jackson;* 7 *Wend.* 367, *Jackson* v. *Adams;* 3 *Pick.* 224; 5 *Cow.* 321, *Jackson* v. *Etts;* 1 *Littell* (*Ken.*) 149; 1 *McLean* 135.

Mr. *Scudder* on the same side.

The object of the act of 1817 was to make alien blood inheritable. The act of 1845 clearly entitled the alien brothers to inherit, and is retroactive in its operation, and if the spe-

cial act of 1836 was out of the question, would pass the estate. Since the act of 1817 was framed, no case has arisen in New Jersey to give it a construction except the case of *Yeo* v. *Mercereau*, which gives to it the effect for which we contend.

The acts of 1835 and 1845 were only intended to settle the meaning of the act of 1817 ; they give the legislative construction of it.

The case of *Goodell* v. *Jackson*, 20 *Johns.* 707, has been commented on and approved in various states. 4 *Johns.* 75, *Jackson* v. *Wright.* The language of the treaty with Great Britain was similar to that of this act, and the same construction was given. 1 *Dess.* 449, *McGrath* v. *Robertson*, 6 *Peters* 107.

Descent to a brother is immediate, and the land will pass although the father is an alien. 9 *Barb. S. C. R.* 595, 644 ; *Duke of Cumberland* v. *Graves ; Law Rep. Nov.* 1852, 399 ; 1 *Cow.* 96, *Sutliffe* v. *Forgay.*

The act of 1836, March 8, giving this property to the widow, is a nullity. It is in contravention of the policy of the act concerning escheats.

The recitals are wrong and are based upon an erroneous judicial construction given by the legislature. *Smith on Stat.* 500 ; 1 *New Hamp. R.* 200 ; 11 *Mass.* 400, *Holden* v. *James ;* 3 *New Hamp.* 473, *Waddell* v. *Winit.*

Private acts will not bind strangers, and the lessors are not parties to this act. *Dwarris on Stat.* 634, 8 *Johns. R.* 520, 556, *Catlin* v. *Jackson.*

Retroactive statutes are valid. 1 *Kent's Com.* 501, 4 *and* 6.

Mr. *Dayton*, in reply.

The act of 1817 gives power to aliens to purchase and to have and to hold as any natural born citizen. We admit that it means to hold to the heirs of the alien as a natural born citizen, but the latter cannot have alien heirs. At common law an alien could purchase and hold until office found. That this was the meaning of the act of 1817 is evident by the fact that the act of 1845 was necessary to enable an alien

to inherit.  This is not a declaration of constructive act, but gives a new right.  4 *W. and S.* 145, *Rees* v. *Waters.*

The remarks of the New York judges only, not their decisions, touch this question.  The words of limitation, " as natural born citizens," are not in the acts of New York, but in their stead words of extension, " any plea of alienage notwithstanding."

The reasoning of the case in 20 *Johns. R.* is really with us, and the subsequent cases in 5 *Cow.* 314 *and* 399, show what was intended.

The opinion of the court was delivered by

ELMER, J.  The lessors of the plaintiff are alien brothers of Bryan Colgan, who was also an alien, and died seized of the premises in dispute, in the year 1834, having purchased the property in the year 1829.  It is admitted by the counsel of the plaintiff, that the lessors are not entitled to the inheritance by virtue of the statutes of descent in force when their brother died, in consequence of their alienage; but they insist that according to the true construction of the act of 1817, to authorize aliens to purchase and hold real estate in this state, (*El. Dig*, 6,) now incorporated in the revised act of 1846, (*Rev. Stat.*, 1,) alien heirs were entitled to inherit to aliens holding by virtue of that statute. This act provides in substance, that it shall be lawful for an alien to purchase lands, and to have and to hold the same to him and his heirs and assigns forever, as fully to all intents and purposes as any natural born citizen of the United States may or can do.

It was held by the supreme court of Massachusetts, in the case of *Com.* v. *Heirs of Hanbury*, 3 *Pick.* 224, that where the state had granted land to an alien by name and to his heirs and assigns, it was estopped from denying the title of heirs who were aliens.  In the state of New York, it has been held that when an alien is allowed specially by statute to take and hold lands, to him and his heirs, such alien has thereby conferred on him a capacity to transmit by inheri-

tance to his alien offspring, and that they have equally a capacity to take; and these decisions are now urged upon us as proper to be followed in construing our act. (*Goodell* v. *Jackson*, 20 *John.* 707; *Jackson* v. *Etz*, 5 *Cow.*, 321; *Jackson* v. *Adams*, 7 *Wend.*, 367; *Aldrich* v. *Manton*, 13 *Wen.*, 458.) But this construction was given to statutes which simply authorized the alien to hold to him and his heirs, and was evidently greatly influenced by the peculiar circumstances attending the leading case of *Goodell* v. *Jackson*. Our statute adds that the alien shall hold, "as fully to all intents and purposes as any natural born citizen may or can do." These words show beyond question, I think, the intention of the legislature to give to the alien a capacity to take and hold real estate, precisely as if he was a natural born citizen, and not otherwise. A natural born citizen could not then hold so that aliens could inherit from him. Unless then we discard those words they necessarily restrict the heirs of an alien to such persons as would be his heirs if he was a citizen. There is no plainer. principle of construction, than that all the words of a statute ought to be allowed their full natural meaning, unless that would be necessarily repugnant to the plain intention of the legislature, or would lead to manifest absurdity or wrong. Now I think the words ought to be very plain and explicit, which would induce us to suppose that the legislature meant to give to an estate in fee simple, vested in an alien, incidents which would not belong to it if he was a citizen. It appears by the case of *Spratt* v. *Spratt*, 1 *Peters*, 343, that an act of the legislature of Maryland provided in express terms, that a foreigner might hold lands which should be transmitted to and be inherited by his heirs or relations as if they were citizens, and the necessary result was, that land which the intestate purchased while he was an alien descended to his alien heirs, while other lands which he purchased after he was naturalized did not so descend.

The opinion of Justice Nevius, in the case of *Yeo* v. *Mercereau*, 3 *Harr.* 404, has been relied on as sustaining the before cited New York cases. It is true that he refers to

them and intimates his opinion that a similar construction should be put on our act of 1817. This construction, however, was not concurred in by the other judges, and not being necessary for the decision, was only an *obiter dictum*. With great respect for the learned judge, I must differ from him, and hold that the legislature meant precisely what they said, that is, to give to an alien the capacity to take and hold real estate as a natural born citizen might do.

An act passed in 1845, (*Pam. Acts*, 92,) now the third section of the revised act of 1846, (*Rev. Stat.* 2,) provides that aliens to whom any lands may have descended from any ancestor, whether alien or not, since 1817, or would have descended, or may or would hereafter descend, in case such person or persons claiming by descent were natural born citizens may have and hold the same as fully as any natural born citizen might, may, or can do. This act being retrospective, covers the case of the lessors of the plaintiff, and would enable them to recover had it not been for a private act passed in 1836, which recites that Colgan had died without issue; and without lawful heirs who could inherit, and enacts that the estate of Colgan in the property should be vested in his widow, Ann Colgan, her heirs and assigns, under whom the defendants claim. Much effort was naturally made by the plaintiff's counsel to get rid of the influence of this act on the case, but I think without success. If the construction given to the act of 1817 is correct, the act of 1836 was passed when the lessors of the plaintiff had no claim whatever, not being heirs who could inherit, and they cannot now object that they are not named in it or that they had no notice of it.

The case of *Jackson* v. *Adams*, 7 *Wend.*, 367, decides that if a natural born citizen or foreigner entitled to hold lands to him and his heirs, dies without heirs, his lands escheat to the state, but the state has no right to enter and take possession until office found, and that a grant, even by a legislative act, can convey no title. I am not able to concur with this opinion. It is not supported by any adjudged case, and is, I think, contrary to well established principles.

Chief Justice Hornblower held, in the case of *O'Hanlin* v. *Den., Spence.* 36, that upon the death of a man without heir or devisee, the title to his lands, *eo instanti*, and before office found, vested in the state; and the same doctrine was held by Justice Randolph, when the case went before the court of errors, (1 *Zab.* 593.) The cases show that when an alien dies, at common law, as he can have no heirs, and the law, *quæ nihil frustra*, never casts the freehold upon one who cannot keep it, his land instantly and without inquest of office, escheats and vests in the state. But a citizen, and an alien since the act of 1817, may have heirs, and I am not satisfied that the proposition stated by those judges is correct to the extent they carry it. Being, however, entirely satisfied that the act of 1836, vested the land in Ann Colgan and her heirs, whether the title of the state was complete before office found or not, I have not thought it necessary to pursue the inquiry. When that act was passed, Bryan Colgan had died without heirs capable of inheriting, the land had escheated and was liable to be seized by the state, by due proceedings in pursuance of the act concerning escheats (*Rev. Stat.* 342). Beyond doubt, a general act might have been passed, vesting all such estates in the widow or in any other relatives. Had it been necessary for the state or the widow to resort to legal proceedings to obtain possession, those proceedings must perhaps have been under the act concerning escheats. Instead of passing a general act, the legislature gave this specific land to the widow. This was clearly within the legislative power. It amounted simply to a declaration that an inchoate right should become a vested and complete right. It was not like a grant by the legislature of property to which the state had no title, but which belongs in fact to another person, which may well be held void, upon the ground that it is no part of the legislative power to take the land of A and vest it in B.

It would seem from the case of *Doe* v. *Redfern*, 12 *East* 96, that there are ancient acts of parliament which restrain the king from granting land, in certain cases, until his right

is ascertained and appears of record. No such acts exist in this state, and if they did, they would not stand in the way of a legislative grant, which would virtually repeal them. What it was competent for the legislative power to do indirectly by general acts, it might do, in a case like this, where no adverse interest was concerned, by a direct and private act. Strangers, who had no legal right to the inheritance, cannot afterwards question such an act, whatever might be its effect as against a person in actual possession.

I am therefore of opinion, that the verdict should have been for the defendants, and that they are entitled to the postea.

HAINES, J., concurred.